[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 13, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-16525
Non-Argument Calendar

_____

D. C. Docket No. 04-00160-CR-P-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CULLY MAX BRAGG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(September 13, 2005)**

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Cully Max Bragg appeals his 320-month sentence, imposed after a jury found him guilty of being a convicted felon in possession of a firearm and made a special finding that firearm at issue in the instant offense was used in connection with another felony. He argues on appeal that the evidence was insufficient to support the jury's special finding. For the reasons set forth more fully below, we affirm.

Bragg was initially indicted for one count of being a convicted felon in possession of a firearm. Later, in response to the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the government took the protective measure of filing a superseding indictment charging the same crime, but adding, inter alia, the following "Special Finding": "That during the course of the offense charged in Count One, the defendant used or possessed the firearm in connection with another felony offense. . . ." Bragg pled not guilty and proceeded to trial where a jury convicted him of the sole count in the indictment and further found that, during the course of the offense, Bragg had used or possessed a firearm in connection with another felony offense.

At trial, the government called Bobby Jolyn Jones. On September 22, 2003, Jones, along with two others, rode with Bragg in a red Chevrolet Cavalier. Jones

2

testified that, while riding with Bragg, Bragg became "mad" at a group of people, pulled a gun out from under the seat of his car, and started firing at the people repeatedly. Bragg unloaded all of the ammunition in the gun and began reloading. At that point, Jones asked to exit the vehicle with his girlfriend, but Bragg said to him that he was not going back to prison and was not stopping the car. Police officers arrived on the scene, and Bragg drove away, refusing to stop until the gun had been thrown out of the car. Jones indicated that, shortly after Bragg had thrown the firearm out the window, Jones grabbed the emergency brake, opened a car door, and fell out of it just prior to being taken into custody by police. Jones told officers where the firearm would be located and later gave a statement to police.

On cross-examination, Jones admitted that, although his statement to the police made reference to Bragg shooting a gun, his statement did not reference Bragg shooting the gun at any particular person or group of people. He also reiterated that, despite having been traveling at high speed over a three to five mile stretch of winding road, he was able to tell police where the gun was thrown out of the car. Jones admitted that, at the time of the incident, he and his girlfriend, Brandy, lived together at Brandy's mother's home. Jones was aware that, at the time Bragg began driving from police, it was illegal for Jones to possess a gun.

3

The government also called Brandy Mayne, who testified that on September 22, 2003, she, Jones, and Bragg drove in Bragg's car to pick up her cousin. After arriving at the destination, they left and, at the top of a hill, Bragg pulled out a gun from inside his car and fired the gun three or four times in the direction of a group of people. Bragg then drove off and attempted to reload his gun as the police were arriving in pursuit. Mayne testified that Bragg was driving fast, at maybe 60 to 70 miles per hour and, at some point while attempting to flee the police, Bragg threw the gun out the driver's side window. The police finally pulled Bragg over, at which point Bragg jumped into the backseat, shouted he was not going to jail again, grabbed Mayne, and began shouting at the police. Mayne was later taken to the police station to give a statement.

On cross examination, Mayne admitted that her statement to the police did not state that Bragg fired his gun at people. She further admitted that her view was limited in the backseat of the car, but that she did see Bragg handling the gun while driving at 60 to 70 miles per hour. Mayne also testified that, prior to Bragg throwing the gun out the window, Jones struggled to try and keep the gun in the car to, according to her, preserve it as evidence.

The government also proffered the testimony of several police officers and an ATF agent, none of which is relevant to the issues presented in this appeal. At

4

the close of the government's case, Bragg moved for a judgment of acquittal, arguing that the government's chief witnesses, Jones and Mayne, offered conflicting and non-credible testimony on the material issue of possession. As to the "special findings" in the indictment, that, if found by the jury, would serve as the basis for sentencing enhancements, Bragg argued that there was insufficient or no evidence to prove that the firearm had been used in connection with another felony. Therefore, Bragg argued that the government could not have satisfied its burden of proof beyond a reasonable doubt.

The district court separated Bragg's motion into two parts, first denying the motion for acquittal, and then asking to hear from the government on what the court termed a "motion to dismiss or prevent the jury from considering" the special findings due to insufficiency of the evidence. The government argued that the testimony of Jones and Mayne established that Bragg had pulled the gun out, aimed it in the direction of people, and then fired it in that direction. Thus, the government argued that the firearm had been used in connection with an "attempted assault." The court took the issue under advisement, and later denied Bragg's motion, permitting the issue to go to the jury.

The court then read the jury instructions, and as to the "special finding," instructed the jury that, if it found Bragg guilty of the underlying offense of felon

in possession of a firearm, it should consider whether the government had proved, beyond a reasonable doubt, that the firearm was used in connection with an attempted assault in the first degree. The elements of the crime, as given to the jury, were that a person commits attempted assault in the first degree if: (1) the person intended to commit the crime of assault, and (2) acting with the intent to commit assault in the first degree, the person did an overt act towards the commission of the offense. The jury was further instructed that assault in the first degree required that the defendant (1) caused serious physical injury to any person, (2) caused such injury by means of a deadly weapon, and (3) acted with the intent to cause serious injury to another person. The court then defined for the jury "serious physical injury," "deadly weapon," "intent," and "overt act."

In his closing argument, Bragg highlighted the inconsistencies in the stories of Jones and Mayne and assailed their credibility, pointing out to the jury that if Bragg had fired the gun at a crowd of people, that would have been a memorable event, but Jones and Mayne omitted it when writing their statements for the police. Bragg pointed out that there were no latent fingerprints found on the gun, and the police never conducted any residue tests to determine whether or not Bragg had touched or fired the weapon in question. He then argued that the only testimony supporting the government's "attempted assault" argument was that of Jones and

6

Mayne, who had a stake in the outcome because they were in an intimate relationship. Bragg implied that, because Jones and Mayne lived together, their stories were the same and designed to "cover their tracks" and keep the firearm in Bragg's hands at all relevant times. Finally, Bragg implied that the true guilty party might be Jones himself. The jury returned a verdict of guilty on the sole count of the indictment, and further found that, as to the "special finding," the firearm was possessed in connection with another felony offense.

A presentence investigation report (PSI) was prepared and noted that, because Bragg had been convicted of at least three violent felonies, and his instant offense was a violation of 18 U.S.C. § 922(g), Bragg should be sentenced as an armed career criminal pursuant to U.S.S.G. § 4B1.4(b)(3)(A), warranting an automatic offense level of 34 because Bragg used or possessed the firearm in connection with a crime of violence, attempted assault in the first degree. Bragg's criminal history points placed him in criminal history category VI, which at offense level 34, provided for a guidelines range of 262 to 327 months' imprisonment.

Bragg lodged no objections to the PSI, and the district court adopted the factual statements and the calculations of the PSI. At sentencing, the only notable issue was whether the court would impose Bragg's sentence to run concurrent with

or consecutive to his state sentences. The probation officer noted that the Sentencing Commission recommended, but did not require, that it run consecutively.

The court then addressed Bragg as follows:

I try to be fair in sentencing to you and everybody else that comes in the court to try to measure up the criminal history and the incident crime with a sentence that makes sense for everybody. . . . If I were to go concurrent, I would probably move up in the guideline range a little bit to take that into account because . . . I was thinking I was going to go lower in the guideline range because you are going to have to serve this consecutively, and I was going to try and give you a little bit of a break there because the guidelines certainly recommend that that be done. If I go against that recommendation, then I'd feel better about that from a fairness standpoint.

Next, the court explained to Bragg that, if Bragg wanted to remain in state custody, a consecutive sentence would all but guarantee he remained there while a concurrent sentence opened the possibility that the state could parole him to serve his time in a federal prison.[1] The court further explained that, if it ran the sentence consecutively, it would impose a lesser sentence within the guidelines range than it would if the sentence were run concurrently. It further informed Bragg that it had no authority over where his federal sentence would be served, although the court would recommend that his sentence be served in a medical facility in order to

_____

[1] During the sentencing, Bragg indicated that he was afflicted with a medical condition and, as a result of a lawsuit on medical care in prisons in Alabama, was being treated while in Alabama state custody at the state's expense. This consideration was important to Bragg.

provide treatment for his illness. After discussing the various possibilities with the court, and hearing that the court was considering a middle of the guidelines range because of, inter alia, Bragg's criminal history, the nature of the offense, punishment to avoid recidivism, health condition, and desire to treat similarly situated defendants equally, Bragg requested that his sentence run concurrent with his state sentences.

The court then imposed a 320-month sentence, and stated that it was:

> [I]mposing a sentence at the higher end of the guidelines range. The Court finds that a sentence at the high end of the range is necessary to address the sentencing objectives of punishment, deterrence, protection of society, and because the Court has listened carefully to the defendant's communications about his current health condition and is trying to structure a sentence that will provide for those needs but, on the other hand, has decided to run the sentences concurrently. . . . [I]f there had been a consecutive sentence, I probably would have gone a little further down in the range to reflect that.

No constitutional objection was made.

On appeal, Bragg argues that his rights to a fair trial, due process, and presumption of innocence were violated because the evidence was insufficient for the jury to have found beyond a reasonable doubt that the firearm in question was used in connection with an attempted assault and, therefore, any enhanced sentence as a result of such a finding was erroneous citing, inter alia, Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Bragg states

9

that the standard of review should be <u>de novo</u> as to the district court's application of the guidelines and clear error for factual findings.

As a preliminary matter, Bragg's argument is actually a sufficiency of the evidence argument regarding the jury's finding that Bragg was guilty, beyond a reasonable doubt, of possessing a firearm in connection with another felony. Based on that jury finding, Bragg's offense level became 34 based on his status as an armed career criminal who used or possessed the firearm at issue in connection with a crime of violence as defined in §§ 4B1.4(b)(3)(A), 4B1.2(a).

Bragg's argument is flawed for a number of reasons. First, while the special finding was submitted to the jury under the "beyond a reasonable doubt" standard, the "special finding" was not, and is not, an element of the offense of conviction, but rather a fact pertinent to sentencing only. Bragg was not, and indeed, could not have been convicted of the special finding of using the firearm in connection with another felony and, therefore, he could not be acquitted of it either.

Second, what the government did in Bragg's case, requesting the special finding by the jury, was not required by it in light of <u>Booker</u>, which is to be applied retroactively to all cases on direct appeal.[2] <u>United States v. Booker</u>, 543 U.S. ___,

_____

[2] As noted above, the government states that it sought the special finding in light of <u>Blakely v. Washington</u> and the uncertainty surrounding the Federal Sentencing Guidelines while <u>Booker</u> was on appeal in the Supreme Court and unresolved.

10

at ___, 125 S.Ct. 738, 769, 160 L.Ed.2d 621 (2005).  While, here the government avoided any potential constitutional error by having the jury find a fact relevant to sentencing, it was not <u>required</u> to do so, as the judges are still free to consider "acquitted" conduct or relevant conduct by a preponderance of the evidence so long as they are not <u>bound</u> to apply the guidelines in a mandatory fashion after making such a finding.  <u>See id.</u> at ___, 125 S.Ct. at 749-51 (holding that the mandatory nature of the Guidelines renders them incompatible with the Sixth Amendment, but that if the Guidelines were merely advisory, a defendant would have no right to a jury determination of the facts a judge deems relevant); <u>United States v. Duncan</u>, 400 F.3d 1297, 1305 (11th Cir. 2005) (holding that <u>Booker</u> permits judges to consider even acquitted conduct when sentencing).  Thus, the jury's finding could have been made by a judge by a preponderance of the evidence or, in fact, made by the jury by a preponderance of the evidence, and the only error that Bragg can complain of is the fact that, at sentencing, the district court perceived that it was bound by the mandatory nature of the Guidelines.

Thirdly, as a matter of procedure, Bragg did not object to the PSI, which used the jury's finding to make the sentencing enhancements at issue in this case. We have held that the failure to object to the PSI means that the facts contained within it are deemed admitted and, therefore, the district court did not commit any

11

constitutional error by applying sentencing enhancements. See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005).

Lastly, even assuming that Booker required the government to have the jury make the finding it did beyond a reasonable doubt, because the jury made the finding, there could be no constitutional error because Bragg's sentence was enhanced based on facts explicitly authorized by the jury's verdict. To the extent he argues that the facts supporting the special finding were insufficient, we review challenged factual findings made at sentencing for clear error only. See, e.g. United States v. Grant, 397 F.3d 1330, 1332 (11th Cir. 2005); United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005) (holding that Guidelines must be calculated properly post-Booker and that this Court would apply same standards of review as applied pre-Booker).

However, the government argues that we should apply the same standard of review we apply when reviewing whether the evidence was sufficient to support a defendant's conviction. Assuming without deciding that the government is correct, we review a challenge to the sufficiency of evidence de novo. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005). A guilty verdict will not be disturbed unless, "given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." Id. (quotation omitted). Finally, we are

"bound by the jury's credibility determinations, and by its rejection of the inferences raised by the defendant." United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005).

In essence, Bragg's argument is that the two witnesses, Jones and Mayne, who testified that they saw Bragg fire a gun at a group of people, were not credible. The jury was presented with Bragg's argument and inference and, by finding that Bragg used the firearm in connection with another felony, found the testimony credible. We are bound by that determination. Peters, 403 F.3d at 1268. Even under clear error review, the government presented sufficient evidence to convince a jury and, therefore, we conclude the finding could not have been clearly erroneous under a preponderance of the evidence standard either.

Accordingly, we conclude that, to the extent it is even necessary for us to review it, the jury's special finding was not based on insufficient evidence under either de novo or clear error review.[3] We, therefore, affirm.

**AFFIRMED.**

---

[3] We decline to review whether the district court committed statutory error by applying the Guidelines in a mandatory fashion because Bragg abandoned the issue by failing to argue it in his initial brief. See United States v. Levy, 379 F.3d 1241, 1243 (11th Cir. 2004) judgment vacated by 125 S.Ct. 2542 (2005) judgment reinstated by United States v. Levy, No. 01-17133, slip op. at 2806 (11th Cir. July 12, 2005).