**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arleys Fernando GARCES,
Defendant–Appellant.**

**No. 14–13016
Non–Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

March 17, 2016.

Roberta Josephina Bodnar, U.S. Attorney's Office, Orlando, FL, Arthur Lee Bentley, III, Maria Chapa Lopez, Michael John Meyer, U.S. Attorney's Office, Tampa, FL, for Plaintiff–Appellee.

Grady Charles Irvin, Jr., Irvin Law Firm, LLC, Tampa, FL, for Defendant–Appellant.

Before HULL, WILLIAM PRYOR and FAY, Circuit Judges.

PER CURIAM:

After pleading guilty, Arleys Garces appeals his total 300–month sentence for conspiracy to possess with intent to distribute 500 grams or more of cocaine while on board a vessel, in violation of 46 U.S.C. § 70506(b), and possession with intent to distribute 500 grams or more of cocaine while on board a vessel, in violation of 46 U.S.C. § 70503(a). On appeal, Garces argues that his 300–month sentence is procedurally and substantively unreasonable. After review, we affirm.

## I. BACKGROUND FACTS

### A. Offense Conduct

Defendant Garces and two codefendants, Gregorio Horacio Campo–Rodriguez ("Campo") and Santos David Cerros Maldonado ("Cerros"), were onboard a boat in international waters east of Honduras when the United States Coast Guard observed the crew throwing items overboard. The Coast Guard retrieved the items, which included a computer, a satellite phone, a global positioning system ("GPS"), and one kilogram of cocaine. The crew told the Coast Guard they were on a fishing expedition and gave false names, and Cerros said he brought the kilogram of cocaine on the boat with his personal possessions. Although Coast Guard officials drilled into the boat's hull, they found no other drugs on the boat, which they then sank.

Campo and Cerros pled guilty—Cerros to possession of 500 or more grams of cocaine with intent to distribute while on board a vessel, and Campo to being an accessory to Cerros's cocaine offense after the fact. Both Campo and Cerros admitted that Cerros brought one kilogram of cocaine onto the boat and intended to distribute it later. After law enforcement interviewed jail informants who were housed with the defendants, however, officers learned that the boat in fact had held a much larger amount of cocaine. Campo and Cerros then "truthfully debriefed" and also admitted that a firearm had been on the boat.

### B. Garces's Guilty Plea and Codefendants' Sentences

On the day of trial, Defendant Garces pled guilty to both counts in the indictment without a plea agreement. The indictment charged the specific drug quantity of 500 grams or more of cocaine. During the plea hearing, Defendant Garces disputed the government's statement in its factual proffer that he had admitted to his codefendants that the boat contained approximately 500 kilograms of cocaine in a hidden compartment. Defendant Garces agreed, however, that he was pleading guilty to 500 grams or more of cocaine and that he understood the district court would determine the drug quantity at sentencing.

Garces's codefendants were sentenced first, and both received substantial assistance reductions pursuant to U.S.S.G. § 5K1.1 due to their cooperation with the government. Cerros received a 151–month sentence. Campo received an 87–month sentence.

### C. Presentence Investigation Report

Garces's presentence investigation report ("PSI") stated that all three defendants were involved in a venture to smuggle approximately 450 kilograms of cocaine from Colombia to the United States, that one kilogram of the cocaine was inadvertently overlooked during the loading process and remained on deck. The remaining, undiscovered 499 kilograms of cocaine were concealed in a hidden compartment on the boat and were sunk with the boat. The PSI stated that while the codefendants were in jail, they used coded mes-

sages to communicate and to make sure they told the same false story to law enforcement.

Using a drug quantity of 450 kilograms, the PSI calculated a base offense level of 38, because the offense involved 150 kilograms or more of cocaine. *See* U.S.S.G. § 3D1.1(c)(1) (2013). After two-level increases for obstruction of justice (giving a false name) and possession of a dangerous weapon (the firearm on the boat), and a two-level decrease for acceptance of responsibility, the PSI recommended a total offense level of 40. With a criminal history category of I, Garces's advisory guidelines range was 292 to 365 months' imprisonment.

### D. Evidence Presented at Garces's Sentencing Hearing

At the sentencing hearing, Defendant Garces objected to, *inter alia:* (1) the PSI's factual statements that the boat had a hidden compartment and was carrying 449 kilograms of cocaine and that Garces communicated with his codefendants in jail to try to tell a false story to law enforcement; (2) any facts in the PSI that suggested Garces knew he was embarking on a smuggling venture or that he knew of an additional 449 kilograms of cocaine on the boat; and (3) being held accountable for 450 kilograms of cocaine. Defendant Garces maintained that when the boat departed Colombia, he did not know cocaine was hidden in its hull and that he became aware of the one kilogram of cocaine only when it was tossed into the water.

The government called Department of Homeland Security Special Agent Dana Hatton, who had interviewed codefendants Campo and Cerros and also four inmates who had spoken with Defendant Garces at the Pinellas County Jail. The district court overruled Defendant Garces's "double hearsay" objection to Agent Hatton's testimony about the contents of her interviews.

According to Agent Hatton, codefendant Campo, the captain of the boat, said more than 300 kilograms of cocaine were hidden in the hull, but he did not know the exact amount because he was not present when the cocaine was loaded. Campo said that it was the job of Defendant Garces and the load guard to know the exact number of kilograms. Codefendant Cerros, the load guard, told Agent Hatton that he also was not present when the cocaine was loaded, but he estimated that the boat contained between 40 and 50 kilograms. Both Campo and Cerros told Agent Hatton that, after the Coast Guard intercepted their boat, the three men concocted a false story that they were on a fishing expedition and agreed to stick to that story.

As for the jail inmates, Agent Hatton interviewed Camillo Torres, who happened to be Defendant Garces's cousin. Torres was an organizer of drug ventures who was extradited from Colombia on drug charges and was awaiting sentencing. Torres told Agent Hatton that Defendant Garces confided in him while they were in jail together, telling Torres: (1) that the cocaine was concealed in the boat's hull; (2) the conspirators originally expected 500 kilograms, but when the final two bales did not arrive, they hid 450 kilograms in the hull; (3) Defendant Garces was present when the cocaine was loaded onto the boat; and (4) one overlooked kilogram of cocaine was discovered after the compartment was sealed and was hidden in a bucket with the GPS unit and the firearm belonging to Cerros. Torres also told Agent Hatton that Defendant Garces said the boat travelled from Colombia to Serava, and law enforcement corroborated this fact through forensic examination of the GPS unit retrieved from the water.

Agent Hatton also interviewed three other jail inmates, all of whom said Defendant Garces had spoken to them of the cocaine smuggling venture. Inmate Alexis Osoria told Agent Hatton that Defendant Garces said there were approximately 600 "keys" hidden in the boat, that he prayed to God that the Coast Guard would not find the cocaine while they were drilling into the boat, and he was happy they sunk the boat.

Inmate Oscar Jaramillo–Rojas told Agent Hatton that he had worked with Defendant Garces on a prior cocaine smuggling venture and that Defendant Garces admitted to Jaramillo–Rojas that he was carrying a load of cocaine when he was arrested.

Inmate Francisco Zelaya–Funez told Agent Hatton that Defendant Garces "reminisced" about prior drug trips, told Zelaya–Funez that he (Defendant Garces) and his crew had fishing equipment aboard the boat in case they were stopped, that Defendant Garces was present when the cocaine was loaded into a false bottom, that the boat was carrying approximately 500 "keys" of cocaine when stopped, and that the Coast Guard drilled into the boat, but did not find the hidden cocaine.

Defendant Garces testified and denied helping load drugs onto the boat, knowing that there were drugs on the boat when it departed, or knowing that that the trip was a smuggling venture. According to Defendant Garces, Campo hired him to help deliver a boat to San Andreas, but Defendant Garces did not know why they were delivering the boat. Defendant Garces said he first learned about the kilo-gram of cocaine when Cerros threw it overboard. Defendant Garces stated that his cousin Torres and all the other individuals who gave statements to Agent Hatton were lying. Defendant Garces admitted giving a false name and lying to the Coast Guard about being on a fishing trip, but Garces explained that he did so because he was afraid.

At the conclusion of the evidence, Defendant Garces argued that the only evidence supporting the 450 kilogram drug quantity was the statements of unreliable "jailhouse snitches." The district court overruled Defendant Garces's objection to the drug quantity in light of all the corroborating evidence. The district court found that the statement given by Torres stood out because Torres was Defendant Garces's cousin and knew things he could only know by talking to Defendant Garces. The district court pointed out that this was not a case of one cooperating witness. Instead, numerous witnesses (1) identified Garces as being involved in drug trafficking and having committed prior drug trafficking offenses, (2) stated that Garces told them he was present when the drugs were loaded and God had blessed him when the Coast Guard did not find the drugs, and (3) said that Garces told them the amount of drugs on the boat.

## E. District Court's Sentencing Determinations

The district court found by a preponderance of the evidence that Defendant Garces was responsible for 150 kilograms or more of cocaine, which resulted in a base offense level of 38.[1] The district

---

[1]. The district court stated it was hesitant to find the exact amount of cocaine involved, and instead found that "there [was] sufficient evidence to believe that there was more than 150 kilograms of cocaine." Garces's counsel asked the district court to apply proposed Amendment 782 to the Sentencing Guidelines, which would lower the offense levels for many drug offenses in U.S.S.G. § 2D1.1(c), but would not be effective until November 1, 2014, four months after Garces's sentencing. See U.S.S.G. app. C, amend. 782. The district

court further found that Defendant Garces had lied under oath during the sentencing hearing, but declined to remove the two-point reduction for acceptance of responsibility in light of the substantial sentence that resulted from the guidelines calculations. The district court noted the advisory guidelines range was 292 to 365 months, and stated its intention to impose "a guideline sentence." The government asked for a sentence at the middle of the range because of Defendant Garces's lies and obstruction. Defendant Garces asked for a sentence at the low end of the range, pointing out that he was going to "do a substantial amount of time" and would not be released until he was 60 years old.

The district court determined that Garces's total offense level was 40, which with a criminal history category of I, resulted in an advisory guidelines range of 292 to 365 months. The district court stated that it had considered the advisory guidelines, the parties' arguments, and the 18 U.S.C. § 3553(a) factors. The district court emphasized the need to protect the public and its "concern ... about Mr. Garces causing drugs to be imported into the United States." The district court imposed concurrent 300–month sentences on each count.

## II. DISCUSSION

We review the reasonableness of a chosen sentence for an abuse of discretion using a two-step approach. *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). First, we look at whether the sentencing court committed any significant procedural error, such as misapplying the guidelines or treatment them as mandatory, failing to consider the 18 U.S.C. § 3553(a) sentencing factors, choosing a sentence based on clearly erroneous facts, or failing to adequately explain the sentence imposed.[2] *Id.*

Second, we examine whether the sentence is substantively unreasonable in light of the § 3553(a) factors and the totality of the circumstances. *Id.* The party challenging the sentence bears the burden to show it is unreasonable. *United States v. Alvarado*, 808 F.3d 474, 496 (11th Cir. 2015). The weight given to any particular § 3553(a) factor is within the district court's discretion, and this Court will not substitute its judgment for that of the district court. *Id.* Indications of reasonableness include a sentence well below the statutory maximum and within the advisory guidelines. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir.2008); *United States v. Hunt*, 526 F.3d 746 (11th Cir.2008). We will vacate a sentence as substantively unreasonable only upon a "definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir.2008) (quotation marks omitted).

court declined, stating that Garces would need to apply for a sentence reduction later. Garces does not challenge that ruling on appeal.

2. The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

## A. Procedural Reasonableness

■ As to procedural reasonableness, Garces contends the district court erred in making a drug quantity finding based on unreliable hearsay testimony by Agent Hatton about her interviews with the two codefendants and the four inmates (Torres, Osoria, Jaramillo–Rojas, and Selaya–Funez).

When a defendant objects to a fact in the PSI, such as the drug quantity, the government bears the burden of proving that disputed fact by a preponderance of the evidence.[3] *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir.2005); *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir.1995). While the preponderance standard is "more relaxed," *Rodriguez*, 398 F.3d at 1291, it "is not toothless," and the district court must "ensure that the Government carries this burden by presenting reliable and specific evidence." *Lawrence*, 47 F.3d at 1566; *see also Almedina*, 686 F.3d at 1315.

Under the advisory guidelines, a defendant is held accountable for not only his charged conduct, but also for any "relevant conduct," which includes his uncharged acts and the acts of his conspirators that were reasonably foreseeable and taken in furtherance of the conspiracy. *See* U.S.S.G § 1B1.3(a)(1)(A)–(B); *United States v. Faust*, 456 F.3d 1342, 1348 (11th Cir.2006) (including as relevant conduct drug quantities for acquitted counts); *United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir.2006). In drug conspiracy cases, relevant conduct includes drug amounts with which the defendant was directly involved and also all reasonably foreseeable drug quantities that were within the scope of the criminal activity that he jointly undertook. U.S.S.G. § 1B1.3, cmt. n. 2; *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993).

Furthermore, " '[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.' " *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir.1996) (quoting U.S.S.G. § 2D1.1, cmt. n. 12, now found at cmt. n. 5). Thus, sentencing "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to the defendant." *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir.1998).

This Court has long concluded that a sentencing court may rely on hearsay evidence, regardless of its admissibility at trial, in determining whether factors exist that would increase a defendant's sentence, provided the evidence has sufficient indicia of reliability, the sentencing court makes explicit credibility findings, and the defendant has an opportunity to rebut the evidence. *See United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir.2010); *United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir.1989); *see also* U.S.S.G. § 6A1.3(a). To prevail on a challenge to a sentence based on the consideration of hearsay evidence, a defendant must show: (1) that the challenged evidence is materially false or unreliable; and (2) that it actually served as the basis for the sentence. *Ghertler*, 605 F.3d at 1269.

Here, Garces has not shown that the hearsay interview statements about which Agent Hatton testified were materially false or unreliable. The six interviewees'

---

**3.** This Court reviews the district court's application of the Sentencing Guidelines *de novo* and its finding of facts for clear error. *United States v. Grant*, 397 F.3d 1330, 1332 (11th Cir.2005). The sentencing court's determination of the drug quantity is a factual determination subject to clear error review. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir.2012).

statements were introduced to prove that Garces knew when the boat departed Colombia that he was involved in a cocaine smuggling operation and more particularly that he knew about the large quantity of cocaine concealed in the boat's hull.

According to Agent Hatton's testimony, all six interviewees—Defendant Garces's two codefendants and the four jail inmates—agreed that the boat was on a cocaine smuggling venture and that Garces was a participant. In addition, codefendants Campo and Cerros admitted that the crew hid the bulk of the cocaine in the boat's hull. This fact was corroborated by jail inmates Torres, Osoria, and Zelaya–Funez, who all said Garces told them the cocaine was hidden in the hull. Codefendants Campo and Cerros further explained that the single kilogram of cocaine left on the deck was hidden in a bucket. This fact was corroborated by inmate Torres, who said that Defendant Garces told him the stray kilogram was hidden in a bucket.

Similarly, codefendant Campo said Defendant Garces was responsible for knowing the amount of the load, and inmates Torres and Zelaya–Funez told Agent Hatton that Garces said he was present when the cocaine was loaded onto the boat. Codefendant Cerros admitted he was the load guard with the firearm, which was consistent with inmates Torres and Osoria's statements that Defendant Garces said Cerros was the load guard. Codefendants Campo and Cerros told Agent Hatton that when their boat was intercepted by the Coast Guard, the three men agreed to stick to their false fishing expedition story, and, according to inmates Osoria and Zelaya–Funez, Defendant Garces told them that the crew had concocted a cover story in case they were caught. Inmates Osoria and Zelaya–Funez both stated—consistent with each other—that Garces told them he feared the Coast Guard would discover the

cocaine while they were drilling, and he was relieved when they sunk the boat.

In other words, the interviewees' statements were wholly consistent on the big picture—that Defendant Garces was a knowing participant in the cocaine smuggling aboard the boat—and corroborated each other on specific details, such as the single kilogram hidden in the bucket, the Coast Guard drilling into the boat, and Cerros's role as the load guard with the firearm, all of which suggests the statements were reliable. As the district court stressed, the sheer number of consistent, corroborating witnesses is compelling.

In addition, the government independently corroborated some details. For example, inmate Zelaya–Funez said Garces told him he became more worried when Nicaraguan officials arrived on the scene because he thought they would tear the boat apart and find the cocaine and that the crew feared being turned over to Nicaraguan authorities. Agent Hatton testified that in fact Nicaraguan authorities pulled alongside the Coast Guard in an interceptor boat while the two law enforcement groups determined who had jurisdiction. Before the Nicaraguans arrived, the crew was uncooperative and gave false names. Once the Nicaraguans arrived, however, the crew's demeanor changed, and they gave the Coast Guard identification with their true identities. Agent Hatton explained that drug smugglers have valid reasons to fear being detained by Nicaraguan authorities, who have been known to kill drug smugglers.

Through Agent Hatton's testimony, the government also corroborated: (1) the inmates' statements that the Coast Guard drilled holes into the boat, but found no cocaine and then sunk the boat; (2) inmate Torres's statement that the boat travelled from Colombia to Serava; and (3) inmate Osoria's statement that the crew was in a

28-foot boat with a single outboard engine when they were caught.

Garces argues that all the statements came from "jailhouse witnesses" who were awaiting sentencing and hoped for more favorable deals as a result of their cooperation. This fact alone does not make their statements unreliable. *See United States v. Riley,* 142 F.3d 1254, 1258 (11th Cir. 1998). Garces also points out that the two codefendants Campo and Cerros lied to the district court during their own plea hearings. While these are factors for the district court to weigh in its credibility analysis, we cannot say Garces has shown that the six consistent hearsay statements were materially false or unreliable. The district court properly determined that the six hearsay statements, taken together, were reliable. *See United States v. Gordon,* 231 F.3d 750, 760–61 (11th Cir.2000) (explaining that the consistency among hearsay statements from cooperating witnesses who contradict the defendant "lends the statements reliability"). Garces's argument on appeal is essentially that the district court should have believed him over the interview statements, but we must accord great deference to the sentencing court's credibility determinations, and the court's choice between two conflicting constructions of the evidence is rarely clear error. *See United States v. Barsoum,* 763 F.3d 1321, 1333 (11th Cir. 2014).

Furthermore, Garces has not shown clear error in the district court's fact finding that the drug smuggling scheme involved at least 150 kilograms of cocaine. Although the interviewees' statements differed as to the amount of cocaine Garces told them was hidden in the boat, the district court did not rely upon any one interviewee's statement to set Garces's base offense level. Instead, the district court conservatively estimated the drug quantity at 150 kilograms or more, an amount well below the 300 kilograms to 600 kilograms that five of the six interviewees said was involved. The evidence as a whole supported the district court's fair and conservative drug quantity finding.

In light of the forgoing, the district court properly held Garces accountable for 150 or more kilograms of cocaine and set his base offense level at 38 pursuant to U.S.S.G. § 2D1.1(c)(1) (2013). Accordingly, Garces has not carried his burden to show his 300–month sentence is procedurally unreasonable.

## B. Substantive Reasonableness

■ Defendant Garces also has not shown that his sentence is substantively unreasonable. Garces's 300–month sentence is in the middle of his advisory guidelines range and fifteen years below the statutory maximum of 40 years, *see* 21 U.S.C. § 960(b)(2)(B), both indications of reasonableness.

Furthermore, the facts and § 3553(a) factors support the district court's chosen sentence. Defendant Garces's importation scheme involved a very large quantity of cocaine, and there was evidence suggesting this was not Garces's first importation trip. The district court, therefore, stressed the need to protect the public from Garces. In addition, the district court found that during the sentencing hearing Garces lied under oath about the extent of the importation scheme and his involvement in it. Under the circumstances, we cannot say the district court committed a clear error in judgment in weighing the § 3553(a) factors and choosing a sentence within the guidelines range.

Garces contends the district court failed to comply with § 3553(a)(6), which requires the sentencing court to consider avoiding unwarranted sentencing dispari-

ties. At sentencing, however, Garces did not argue there was an unwarranted disparity between his sentence and his codefendants' lower sentences. In any event, Garces has not shown that the disparity between his sentence and those of his codefendants is unwarranted. Both Campo and Cerros pled guilty pursuant to written plea agreements early in the criminal proceedings and received significant sentence reductions pursuant to U.S.S.G. § 5K1.1 because of their cooperation with the government. Thus, his codefendants were not similarly situated to Garces. *See United States v. Docampo,* 573 F.3d 1091, 1101 (11th Cir.2009) (explaining that the sentence disparity between cooperating defendants and a defendant who does not provide assistance to the government is not "unwarranted" because the defendants are not similarly situated).

For all these reasons, we cannot say Garces's 300–month sentence was an abuse of discretion.

**AFFIRMED.**